IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 18, 2018

**STATE OF TENNESSEE v. HARRY GILLEY**

**Appeal from the Criminal Court for Hamilton County**
**No. 297340, 298587, 297463, 297465, 297466, 297701, 298581, 298583**
**Thomas C. Greenholtz, Judge**

_____

**No. E2018-00691-CCA-R3-CD**

_____

The Defendant, Harry Gilley, pled guilty to one count of aggravated burglary, a Class C felony; four counts of burglary of a habitation under construction, Class D felonies; five counts of felony theft of property, Class E felonies; two counts of misdemeanor theft of property, Class A misdemeanors; and one count of vandalism of property, a Class A misdemeanor, stemming from charges in eight indictments. In exchange for his pleas, the Defendant received an effective Range III sentence of fifteen years with the manner of service to be determined by the trial court. After a hearing, the trial court ordered that the Defendant serve his sentence in confinement, which the Defendant appeals. After review, we affirm the sentencing decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Steven G. Moore, Chattanooga, Tennessee, for the appellant, Harry Gilley.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Neal Pinkston, District Attorney General; and Ancharlene D. Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The Defendant and a co-defendant, David Walker, were charged with multiple counts of burglary, theft and vandalism as a result of their breaking into homes that were under construction or newly built and stealing the appliances. The State summarized the underlying facts of the cases as follows:

[B]oth [the Defendant] and [co-defendant] were involved in numerous amounts of property offenses throughout Hamilton County. Essentially they would break into newer built homes, newer constructed homes throughout the East Brainerd, Ooltewah areas throughout the county. Once they did that they would look for new appliances to take from those properties.

Upon removing that property and in the process of removing that property they would cause significant damage to the homes from which they were taking that. The damage that was caused was suffered by several construction companies throughout the Hamilton County area.

The Defendant pled guilty to one count of aggravated burglary, four counts of burglary of a habitation under construction, five counts of felony theft of property, two counts of misdemeanor theft of property, and one count of vandalism of property in exchange for an effective sentence of fifteen years with the manner of service to be determined by the trial court. At the sentencing hearing, which was conducted over the course of several dates, a representative from one of the victim construction companies stated that approximately 50 of the 156 homes his construction company built in 2015 were broken into over the course of a 6 to 12 month time period. He testified to the physical damage done to the homes, as well as the uneasiness the break-ins brought into the neighborhoods. He said that other homebuilders in the area were likewise victimized. He noted that since the Defendant and co-defendant were captured, "[W]e've had zero break-ins and zero thefts. Since then. Zero. Not one."

Hannah Rooker, a presentence investigator for the Chattanooga Office of Probation and Parole, testified that she prepared the Defendant's presentence report. Ms. Rooker reviewed the Defendant's criminal history for the court, beginning with a conviction in 1980 when the Defendant was twenty-one years old. The trial court counted six felonies and nineteen to twenty-three misdemeanors, depending on the appropriate classification for city court offenses, in the Defendant's record. Ms. Rooker noted that the Defendant's criminal history indicated that he would have been on parole in another case when he was arrested on the current charges.

Clair Mills, a corrections counselor with the probation and parole department of the Tennessee Department of Correction, testified that she interviewed the Defendant in

order to complete the risk and needs assessment of the presentence report. She said that the assessment classified the Defendant as a low risk to reoffend, but she noted that the assessment was based on a fewer number of prior convictions than the Defendant actually had on his record.

Ms. Mills later submitted a letter to the court in which she explained "the intricacies of the STRONG-R evaluation tool insofar as it is being used to consider risk and needs." Regarding the STRONG-R assessment, the court stated:

> Very candidly, the [c]ourt has concerns about how the STRONG-R assessment calculates previous convictions in its risk analysis, because as the letter suggests it groups all convictions that are disposed of or resolved on a single date no matter when the offenses occurred variously. So it is possible that you could have separate offenses occurring over a period of time, but because of the happenstance of the court scheduling and a resolution on one particular day, those are counted under the STRONG-R assessment as only one conviction. That strikes me as bizarre, but that's where it is. And so we'll take it for what it's worth.

David McNabb, the executive director for Teen Challenge Midsouth Adult Center in Chattanooga, testified that Teen Challenge is a faith-based twelve-month residential recovery program for adults and explained the details of the program. Mr. McNabb said that the Defendant had been accepted into the program, pending the court's approval, and he believed that the Defendant would be a good candidate for the program. Mr. McNabb said that "[a]t one point in time back probably the late 70s[,] [the program] had [an] 86 percent success rate," meaning that the graduates were "living clean" five to seven years after completing the twelve-month program. Mr. McNabb estimated that of those who enter the Teen Challenge program, approximately forty percent complete it.

The Defendant testified that he had been in custody in the Hamilton County Jail for "almost 500 days[.]" He said that after several requests, he was allowed to "go on the work force" at the jail, and "[i]t wasn't just any job, it was one of the most trusted jobs at the Hamilton County jail, in supply." He had not been written up, had disciplinary problems, or been fired from his job, and had been given permission to enter highly secured areas of the jail to perform work duties. The Defendant presented letters of support from members of the Hamilton County Sheriff's Department, as well as a diploma from the jail inmate workforce program signifying that he had "demonstrated a successful work ethic [as] an inmate workforce volunteer for 345 shifts."

The Defendant testified that he had applied to further his education since being in custody. He said that he served in the Army from 1977 to 1979. He testified about his

repeated efforts to get accepted into the Teen Challenge program and then addressed the court as follows:

> When I first entered this jail, Your Honor, I'm not the same man that sits here today. I thought God's all I got. And I realized that he's all I've really needed. He's been good to me. Whatever the Court's decision is here today, I'm good with it because I'm not the same man that entered this jail almost 900 days ago.
>
> I think it's important for me to get to Teen Challenge because it's going to enable others to look at my life and the age that I'm at and all and say, hey, this thing is doable. All things with God are possible.

The Defendant testified that drugs were "rampant" in the jail, but he had stayed clean. Although he had been offered the opportunity to take drugs and to sell drugs, he declined to do so. He acknowledged having a "pretty lengthy criminal history" but explained that the majority of those offenses were related to his drug abuse. The Defendant affirmed he pled guilty to the various offenses in this case and claimed to accept responsibility for his actions. He said that while in custody on the present offenses, he cooperated with law enforcement by providing information on cold cases and corrupt officers. The Defendant admitted that he was on parole during the time period he committed the present offenses and that he had also falsified his drug screen specimens while on parole.

Joel Davenport testified that he was previously the director of the Transformation Project, a faith-based alternative to incarceration, and prior to that had worked with Teen Challenge. Mr. Davenport said that he first met the Defendant in 2001 when they both were incarcerated and involved in some classes together in the jail. Mr. Davenport was aware that the Defendant had been accepted into Teen Challenge and had reached out to some people with the program on behalf of the Defendant.

When asked if he thought the Defendant was a good candidate for the Teen Challenge program, Mr. Davenport initially responded, "Well, I do[,]" but then "qualified" his answer with a brief history of his dealings with the Defendant. He explained that he was the director of the Transformation Project when the Defendant entered the program, and the Defendant had been in a number of his classes. Mr. Davenport said that he had "seen progress at different times with [the Defendant,]" but he was aware that the Defendant "eventually had gone back into relapse." The Defendant told Mr. Davenport that "one of the problems was that nobody was keeping their thumb on him like [Mr. Davenport] was." Mr. Davenport noted that Teen Challenge is a more highly supervised program than the Transformation Project. Mr. Davenport opined that

the Defendant "could only be successful in the outside with that intensive structure." He elaborated that the Defendant "is a good inmate. And he's a good worker. When he's sober he's a very nice guy. He's a hard worker, very focused. But he's going to have to have somebody holding his hand very regularly until he is very certainly on the right footing." Concerning the Defendant's potential for rehabilitation, Mr. Davenport summarized: "I see [the Defendant], one, scared of where he's gotten himself in life, which I've never seen before. And I see him ready to not come back."

Asked if there is a time limit for participation in Teen Challenge, Mr. Davenport stated that the program was a minimum of one year but that there were "people that it has taken them three years to finish Teen Challenge. And they're still working there as well because they realize that they're not safe just going back out in the world." Mr. Davenport testified that the Defendant has a sister who is "very supportive and very strong[,]" and that he had "coached her over the years" to help her avoid enabling the Defendant's bad behavior. Mr. Davenport elaborated:

> He's got to take responsibility for his decisions and his actions. But she does care and that's a leg up on a lot of people in the system is to have somebody on the outside that really cares, and cares enough to call the police on you if she needs to.

Detective Brian Ashburn of the Hamilton County Sheriff's Office testified that his office investigated "a rash of burglaries of homes that were under construction or in the process of being built" that began in February 2015. He noted that "[p]rimarily the refrigerators, stoves, microwaves. Any appliances that w[ere] in the house" were being removed from the houses. On October 12 or 13 of that year, Detective Ashburn was involved in the surveillance of the Defendant and co-defendant with the Chattanooga Police Department. Police heard a phone call between the Defendant and Wendy Snyder wherein Ms. Snyder requested delivery of a stove, which led to their surveillance of the Defendant.

Detective Ashburn testified that officers began watching the Defendant around 11:00 p.m. and followed him around for approximately three hours. At some point, they lost contact with the Defendant, but a patrol unit spotted his vehicle with "what looked like to be an appliance in the back of the Jeep Cherokee." The Defendant and co-defendant were then stopped and taken into custody. Through their investigation, the police determined that the Defendant and co-defendant were stealing appliances and selling them to Ms. Snyder, who then sold them on Craigslist. Detective Ashburn said that the Defendant did not provide any information to assist in the recovery of the stolen property.

After a lengthy and detailed discussion in which it considered the principles of sentencing and the evidence before it, the trial court ordered that the Defendant serve his sentence in confinement.

## ANALYSIS

The Defendant argues that "the trial court abused its discretion in finding that the nature and circumstance of the offense and the [D]efendant's criminal history outweighed all the evidence before the court that favored an alternative sentence."

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing; and
>
> (8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption

of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. This standard of review also applies to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

The trial court noted that the 59-year-old Defendant had a criminal record consisting of six prior felony and twenty-two prior misdemeanor convictions, beginning at the age of nineteen. The court observed that the Defendant's criminal history began with drug convictions that progressed to misdemeanor theft that progressed to felony theft that progressed to aggravated burglary. The court determined that the Defendant used his criminal conduct as a means to further support himself because "he was tired of the hard construction work that he was doing[.]" The court found that the interest of society in being protected from future criminal conduct by the Defendant was great based upon his previous criminal history. The court observed that the Defendant's criminal behavior also included his "history of substance abuse . . . knowing that it is illegal." The court recalled that the Defendant had not previously been in a treatment program involving release in the community but did have an unsuccessful attempt to complete the Transformation Project program.

In looking at mitigating factors, the court found that the Defendant's conduct did not cause or threaten serious bodily injury but did not give the factor much weight. The court found that the Defendant tried to help authorities in uncovering offenses committed by other people and weighed that as a mitigating factor in the Defendant's favor. However, the court found that the Defendant did not help authorities in recovering the property stolen in his crimes. The court credited as mitigation that the Defendant had displayed some acceptance of responsibility and exhibited "model behavior" while in custody. The court noted that the Defendant was a veteran with an honorable discharge.

In looking at enhancing factors, the court placed great weight on the Defendant's previous history of criminal convictions and criminal behavior. The court found that the Defendant was a leader in the commission of the offenses. Although not giving it much weight, the court found that the amount of damage to property sustained by the victim was "more than should have been inflicted on the property simply by removing the appliances." The court found that the Defendant failed to comply with the conditions of a

sentence involving release in the community in that he had a history of probation and parole violations and that he committed the present offenses while released on parole.

The court determined that the Defendant's actions caused significant harm to the community and was something the Defendant did not fully appreciate. The court found that the crimes "were the result of planning" and "not the product of impulsivity." The court believed that the Defendant was aware that his criminal conduct would cause harm, but "he thought that it would be mitigated by insurance" and showed a "callous indifference to the victims and the loss that had been caused." The court questioned the Defendant's expression of remorse, finding that "on balance the remorse was more inward focused than outward focused." The court observed that leniency had been granted to the Defendant by virtue of a plea deal to less time than "would be appropriate."

The court expressed a need to avoid depreciating the seriousness of the offenses, not because of the egregiousness of the offenses, but because of the repeated criminal conduct and damage caused to the victims. The court lastly noted that the Defendant's behavior was intentional and motivated by the desire for profit or gain and therefore that there was the need to provide an effective deterrent to others who would commit similar offenses. The court summarized that in reaching its sentence it placed great weight on the nature and circumstances of the offenses and the Defendant's prior criminal history.

The record shows that the trial court thoroughly considered and weighed the principles of sentencing and all the evidence before it, including the letters from the Hamilton County Sheriff's Office and Hamilton County Jail staff and testimonies of David McNabb from the Teen Challenge program and Joel Davenport from the Transformation Project. The trial court's imposition of a sentence of confinement is entitled to a presumption of correctness and is affirmed.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the trial court's imposition of a sentence in confinement.

_____
ALAN E. GLENN, JUDGE

- 9 -